**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **TEXICAN CRUDE & HYDROCARBONS, LLC,** § § § | |
| *Plaintiff,* § § | |
| v. § | **CIVIL ACTION NO. _____** |
| § | |
| **DEVON ENERGY PRODUCTION COMPANY, L.P.** § § § § | |
| *Defendant.* § | |

## COMPLAINT

Plaintiff Texican Crude & Hydrocarbons, LLC files its Complaint against Defendant Devon Energy Production Company, L.P. and respectfully shows the Court as follows.

### I. PARTIES

1.  Plaintiff Texican Crude & Hydrocarbons, LLC ("Texican") is a Texas limited liability company with its principal place of business in Houston, Harris County, Texas.

2.  Defendant Devon Energy Production Company, L.P. ("Devon") is an Oklahoma limited partnership with its principal place of business in Oklahoma City, Oklahoma. Devon is authorized to conduct business in Texas. Devon may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### II. JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 (diversity jurisdiction) because Plaintiff and Defendant are of diverse citizenship and the amount in controversy exceeds $75,000.

4. Plaintiff Texican is a limited liability company and is therefore a citizen of the states in which its members are citizens. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). Texican's sole member is Texican Natural Gas Company, LLC. Texican Natural Gas Company, LLC is a Texas limited liability company with its principal place of business in Houston, Texas. Texican Natural Gas Company, LLC's sole member is Texican Holdings, Inc. Texican Holdings, Inc. is a Texas corporation with its principal place of business in Houston, Texas. A corporation is a citizen of the state in which it is incorporated and the state where it has its principal place of business. 28 U.S.C. §1332(c)(1). Therefore, Plaintiff is a citizen of Texas.

5. Defendant Devon is a limited partnership and is therefore a citizen of the states in which its partners are citizens. *Harvey*, 542 F.3d at 1079. Devon's two partners are DVN Operating Company, L.L.C. and Devon OEI Operating, L.L.C.

    a. DVN Operating Company, L.L.C. is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Oklahoma. DVN Operating Company, L.L.C.'s sole member is Devon OEI Operating, L.L.C.

    b. Devon OEI Operating, L.L.C. is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Oklahoma. Devon OEI Operating, L.L.C.'s sole member is Devon OEI Holdings, L.L.C.

    c. Devon OEI Holdings, L.L.C. is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Oklahoma. Devon OEI Holdings, L.L.C.'s sole member is Devon Energy Corporation (Oklahoma).

    d. Devon Energy Corporation (Oklahoma) is a corporation organized under the laws of the State of Oklahoma with its principal place of business in Oklahoma.[1]

Therefore, Defendant is a citizen of Oklahoma.

6. Complete diversity between the parties exists.

---

[1] *See* Notice of Removal at ¶¶ 8-12, *Prestige Oilfield Services, LLC v. Devon Energy Production Co., L.P.*, No. 2:18-cv-01173-GBW-GJF (D.N.M. Dec. 13, 2018), ECF No. 1.

7. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district. The subject contract further provides that "any disputes arising hereunder shall be governed by the laws of the State of Texas." Exhibit 1 at General Terms and Conditions, N.

### III. FACTS

8. Devon is an oil and natural gas production company focused on onshore production in the United States, with the Eagle Ford Shale being one of its core areas for development. Devon's Eagle Ford operations are primarily located in DeWitt County, Texas.

9. Devon's Eagle Ford operations require it to truck a large quantity of condensate production, exceeding approximately 25,000 barrels per day.

10. Condensate is a sweet light liquid hydrocarbon typically separated out of a natural gas stream at the point of production. Prices for the sale of condensate are typically determined by adjusting the published price of one of the following indices – West Texas Intermediate Crude Oil (NYMEX) ("WTI") or Brent Crude (ICE) ("Brent"). WTI is traded on the New York Mercantile Exchange and is the benchmark most commonly utilized for onshore sales of condensate in the United States. Historically, Brent was traded on the International Petroleum Exchange in London but is now traded on the Intercontinental Exchange. Brent is commonly utilized as the benchmark for sales outside of the United States. For purchases at the wellhead or lease, the index prices are commonly adjusted downward to account for the costs of getting the product to market, profit margin for intermediaries, and other factors.

11. In June 2019, one of Devon's existing markets cancelled the purchase of roughly 5,000 barrels per day of condensate from Devon's Eagle Ford operations. These barrels of

condensate are low-density with high API gravity levels, which is more difficult to market than heavier condensate.

12. Devon bid this production out to companies including Texican.

13. Texican is an oil and gas company that conducts full-service purchasing of onshore and offshore production from producers, including production from the Eagle Ford Shale. Texican frequently purchases production at the wellhead or lease, and handles transportation and resale of the production to the market.

14. Both Texican and Devon are merchants that are knowledgeable and sophisticated participants in numerous transactions relating to the purchase and sale of crude oil and associated products such as condensate.

15. Devon knew that Texican was going to purchase the condensate for resale to the market. As is customary in the industry, Texican composed its offer to Devon based on the pricing that it was able to locate in the market each month.

16. Initially, the only market that Texican was able to find at the time was a "Brent-minus" market. In other words, the initial structure of the deal was that once Texican purchased the condensate from Devon, it would resell the production to its market using Brent-based pricing with a deduction adjusted each month. Therefore, Texican's offer to Devon was based on the Brent index minus the costs to get the product from the lease to its market with a profit margin for Texican and any further deduction necessitated by the available resale price in the market.

17. The Devon representative who received, and ultimately accepted, the offer informed Texican prior to reaching an agreement that he had never done a Brent-based deal while at Devon.

18. Nonetheless, Devon accepted Texican's purchase offer to commence monthly sales to Texican using Brent-minus pricing.

19. Accordingly, Texican as the buyer and Devon as the seller entered into the Purchase Contract for the oil and condensate production of certain wells on June 28, 2019. Exhibit 1. The agreement is "effective July 1st 2019" and "continue[s] month to month until cancellation." The initial Contract price was "Ice Brent CMA" with an adjustment of -$8.30. *Id*. at Ex. "A". Subsequently, the parties entered into several binding Contract modifications altering the price to which they agreed for subsequent delivery months and adding additional sources of production. Exhibits 2-7. Collectively, these will be referred to herein as the "Contract."

20. Shortly after Texican began purchasing the condensate, Devon requested that Texican revise the pricing under the Contract from a "Brent-minus" structure to the more familiar WTI index structure in which the WTI index (plus or minus the Argus CMA roll and the Argus MEH Cushing trade differential) would be used in conjunction with a similar deduction as was being used in the initial "Brent-minus" formula.

21. Coincidentally, Texican's resale party (its "market") suggested a similar change, starting on September 1, 2019, to move from Brent pricing to WTI pricing and Texican agreed to the change with both parties.[2]

22. Texican immediately, in late July 2019, informed Devon that its market had agreed to change to WTI pricing as requested by Devon and effective September 1, 2019 the Contract price would change from Brent to WTI minus adjustments. Devon's representative, Michael Day, agreed to the change in conversations with Texican's representative, Skip Redd.

---

[2] Texican began purchasing condensate from Devon in July 2019. From July-August 2019, the price was Brent pricing minus an adjustment of -$8.30.

23. Texican subsequently sent a written confirmation of the agreement to Devon stating that "[e]ffective September 1, 2019 the new price is NYMEX WTI Merc days only, the Argus Differential to CMA NYMEX, the Argus Houston/WTI Differential and the deduct becomes -$8.35 on all leases." Exhibit 2. The written confirmation also added additional leases (sources of production to be sold that Devon asked to be added) to the Contract. *Id*. The written confirmation further provided that "[a]ny matter not specifically covered herein arising in connection with this Agreement shall be handled in accordance with generally accepted customs and practice in the industry." *Id*. Devon did not object to the written confirmation. There is no dispute that Devon received the confirmation.

24. In September 2019, relying on the Contract modification, Texican purchased the condensate from Devon, including that from the newly added leases utilizing the newly agreed WTI based pricing formula, and resold it to its market using a similar WTI based pricing formula.

25. After each month's purchase from July-August 2019, as is customary practice in the industry, Texican and Devon would perform a settlement whereby they would compare volumes that were produced and shipped with volumes that were received and settle on a volume, price, and resulting amount owed by Texican.

26. Conforming to the parties' normal course of dealing, Texican and Devon conducted a settlement of the September 2019 purchase. The volume, price, and amount owed by Texican was settled by the parties using the WTI pricing minus adjustments as agreed. Texican paid the purchase price as agreed and settled by the parties. Devon accepted the payment and agreed to the underlying volume and price calculations for each lease producing condensate being sold to Texican under this Contract.

27. In October and November 2019, relying on the parties' course of dealing and further Contract modifications confirming the pricing, Texican continued to purchase and resell the condensate, including the new leases, using the WTI pricing with an adjustment of -$8.35.

28. Additional leases were added to the Contract, per Devon's request, in October and November 2019 and therefore, Texican sent written confirmations adding these leases, which showed the price remaining at WTI with an adjustment of -$8.35. Exhibits 3-4. Devon did not object to the written amendments to the Contract for these months and the parties as usual conducted settlements for October and November 2019. Devon accepted Texican's payment using the agreed and settled price of WTI minus $8.35 for those months.

29. On November 8, 2019, the parties entered into a Netting Agreement "in order to more efficiently facilitate the accounting of payments due and owing" under this Contract and another set of transactions the parties agreed to engage in at Cushing, Oklahoma (where Texican was the "seller" and Devon the "buyer"). Exhibit 8. The concept behind the Netting Agreement was to have Devon buy hydrocarbons from Texican at the Enterprise terminal in Cushing, Oklahoma approximately equal to the amount owed by Texican as payment under the Contract in order to eliminate the need for Texican to put up credit support each month for the purchases it was making from Devon in the Eagle Ford Shale.

30. Consistent with the parties' normal course of dealing and industry standards, the Netting Agreement called for a monthly settlement after each of the two contracts were settled that month. The parties would continue to issue invoices for each contract in accordance with their underlying terms and at least three days before the payment day for each contract account, each Party was to "confer by any reasonable means … and compare and confirm invoice amounts and

7

total amounts owed by and/or to each other" in order to net the two account balances for that month against one another. *Id*. at § 1(b).

31. The Netting Agreement did not allow for the parties to reopen already settled accounting months for purposes of recalculating the net balances arrived at for a particular month.

32. In the ordinary course of business, Texican continuously searched for a better price in the market for the Devon condensate under this Contract, as repeatedly amended.

33. Consistent with the periodic Contract amendments accepted by both parties in their course of dealing, Texican and Devon regularly communicated during the month by telephone and e-mail regarding pricing trends and potential changes for upcoming delivery months. In or around November 2019, Devon indicated to Texican that it desired a better price for the barrels that Texican was purchasing in future months. Texican assured Devon that it would continue to look for improved pricing opportunities.

34. Through negotiations with its resale customers in the market, Texican was able to lower the "minus" adjustment in the November price formula applicable to December in Devon's favor. Effective December 1, 2019, the parties agreed to lower the adjustment. Texican sent a written confirmation providing that the price would be WTI with an adjustment of -$7.95. Exhibit 5. Devon did not object to the written confirmation and ultimately settled this month based on this price.

35. Effective January 1, 2020, the parties agreed to lower the "minus" adjustment again in conversations and e-mails, after which Texican sent a written confirmation providing that the price for deliveries starting January 1, 2020 would be WTI minus $7.35. Exhibit 6. Devon did not object to the written confirmation and ultimately settled this month based on this price.

36. In February 2020, Texican's resale market price decreased by 10 cents, but Texican did not pass that decrease to Devon (as an increased deduction) for the price in February 2020 in an effort to meet Devon's request for improved pricing.

37. For the first time, in late February 2020, Devon indicated that it had an issue with the pricing for the September through November 2019 production months. Devon and Texican had a call on or about February 26, 2020. During the call, Texican offered to reduce the February deduction by 15 cents from -$7.35 to -$7.20 to further enhance Devon's pricing as a means to establish goodwill going forward. Devon's representatives indicated they were appreciative on the call and accepted the price reduction on the call.

38. Texican sent a written confirmation of this agreed February 2020 price reduction on March 10, 2020. Exhibit 7. Devon did not object to the written confirmation at that time.

39. Shortly after this Contract amendment and consistent with the parties' normal course of dealing, Texican and Devon conducted a settlement of the February 2020 purchase under this Contract using the agreed price of WTI minus $7.20.

40. On March 18, 2020, Texican and Devon, in the ordinary course of dealing, similarly settled the February 2020 Cushing transaction whereby Devon purchased hydrocarbons from Texican. The parties agreed that Devon owed Texican $2,756,245.48 for the February 2020 Cushing transaction.

41. However, the very next day, on March 19, 2020 (the day before payment was due from Devon to Texican for February 2020 sales at Cushing), Devon sent a letter to Texican alleging that for the production months of September-November 2019 it did not have "proper notice to effectuate any pricing change" on its sales to Texican out of Eagle Ford leases under this Contract—despite the written amendments for each of those months Devon had received and

9

accepted previously without objection in the ordinary course of the parties' dealings and the parties' settlement of the price for each of those months. Devon further stated that, as a result of this alleged lack of agreement on monthly price changes for September, October, and November only (and for no other reason relating to any challenge of the prior settlements for the relevant months or any other months), it was arbitrarily withholding $1,096,625.74 in the netting process for February. Devon did not seek any offset in this netting calculation for the December-February WTI-minus pricing formula changes previously agreed to by the parties as reflected in Contract modifications for those months already delivered to Devon as well.

42. As a result of this unilateral and arbitrary action by Devon on March 19, 2020, after conclusion of deliveries for February under both the Eagle Ford and Cushing transactions, Texican was wrongfully deprived of funds due for completed sales to Devon at Cushing for which there is no dispute regarding the volume, quality, or timely delivery of the agreed volumes. The resulting "short payment" from Devon to Texican was in the amount of $1,659,619.74. Yet Devon wrongfully received and accepted the benefit of full delivery of $2,756,245.48 worth of crude oil from Texican at Cushing as agreed to by the parties, without full payment for same.

43. Texican objected to this wrongful conduct by Devon in response to Devon's March 19, 2020 letter.

44. Subject to Devon's improper withholding of roughly $1.1 million, Texican otherwise complied with the Netting Agreement.

45. On April 7, 2020, a month after receiving the February price change confirmation for Eagle Ford sales to Texican, and weeks after settling the February account, Devon sent Texican a letter stating that the -$7.20 "was not an amount agreed upon prior to the production month" and "[g]iven that February production month has already been settled, Devon will be remitting to

10

Texican $23,946.20." Texican subsequently received a wire transfer in this amount that it is holding in suspense pending resolution of this dispute.

46. Following February 2020, Devon did not renew the Eagle Ford or Cushing contracts with Texican.

## IV. CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT

47. Texican incorporates by reference the allegations set forth in Paragraphs 1 through 46 of this Complaint as if fully stated herein.

48. Devon and Texican are knowledgeable and sophisticated merchants that routinely engage in oil and condensate purchase and sale transactions.

49. On or about June 28, 2019, Texican and Devon entered into a valid and enforceable contract. Exhibit 1. The Contract provided that Texican would purchase certain oil and condensate production from Devon's Eagle Ford operations.

50. At the request of Devon, Texican arranged with its market to switch the pricing benchmark from Brent to WTI effective September 1, 2019.

51. During the course of performance, the parties entered into several binding Contract modifications reflecting price changes and the addition of leases to the Contract. Exhibits 2-7.

52. Devon did not object to any of the written confirmations modifying the Contract within 10 days of receipt.

53. Devon further validated and confirmed the price and lease addition modifications each month through the settlement process that the parties completed each month as a matter of course.

54. Texican fully performed its obligations under the Contract. Texican purchased and paid Devon for the condensate pursuant to the terms of the Contract and its modifications.

55. Relying on the Contract and modifications, Texican resold the condensate to its market based on the Contract's pricing.

56. Devon breached its agreements with Texican, first, by disregarding agreed pricing provisions of the Eagle Ford condensate sales Contract and then, by refusing to pay the full (and previously agreed) price for its Cushing crude oil purchases from Texican in February 2020.

57. By means of its misconduct, Devon wrongfully, retroactively, and without justification withheld $1,096,625.74 owed to Texican for crude oil purchased from Texican and delivered to Devon at Cushing, Oklahoma based on an improper and unjustified offset claim relating to sales of condensate to Texican by Devon from its Eagle Ford leases during the settled production months of September-November 2019.

58. Devon has likewise wrongfully obtained crude oil from Texican having a value at the time (as agreed to by the parties) of $1,096,625.74.

59. Texican has made several efforts to resolve this dispute with Devon.

60. As a direct and proximate result of Devon's breach, Texican has been damaged in the amount to be proven at trial in the amount of at least $1,096,625.74.

61. <u>Attorneys' Fees</u>. Texican is entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practices & Remedies Code § 38.001(8).

## COUNT TWO
## PROMISSORY ESTOPPEL

62. Texican incorporates by reference the allegations set forth in Paragraphs 1 through 61 of this Complaint as if fully stated herein.

63. Devon requested that Texican purchase certain of its Eagle Ford condensate production.

64. Devon knew and understood that Texican would be purchasing the condensate production for immediate resale to the market.

65. As is customary in the oil and gas industry for such purchases, the agreed pricing is based on the resale pricing structure. Therefore, Texican's reliance on Devon's promises regarding pricing was foreseeable by Devon.

66. Over the course of the parties' dealings, Devon made Texican promises regarding purchase price for the condensate and repeatedly reaffirmed its promises through its conduct.

67. Indeed, shortly after Texican began purchasing and reselling the condensate, Devon requested that the pricing be changed from Brent to WTI, an index that was more familiar to Devon.

68. Based on Devon's request and promise to use WTI pricing, Texican planned to approach its market but received a similar suggestion from that market representative which led to the agreed pricing change from Brent to WTI starting in September 2019.

69. Texican informed Devon in July 2019 that the pricing would change as requested to WTI in September 2019. Devon promised to honor the new pricing structure that it requested.

70. Texican's reliance on the price promised by Devon was reasonably foreseeable.

71. To its detriment, Texican reasonably and substantially relied on the price promised and requested by Devon, by purchasing and reselling the condensate to its market using WTI pricing in September 2019.

72. The promised price requested by Devon was confirmed by Texican in a written confirmation sent to Devon on October 11, 2019. Exhibit 2. Devon did not object to the requested and promised price.

73. In the normal course of dealing, Devon and Texican settled the September production account in mid-October 2019. Devon and Texican reviewed and agreed on the volume purchased, purchase price, and amount owed by Texican. Devon again did not object to the requested and promised price.

74. Texican paid the promised and settled purchase price of WTI with an adjustment of -$8.35.

75. Texican, to its detriment, continued to rely on the pricing promised and requested by Devon (and now confirmed by Devon through the parties' course of dealing), by purchasing and reselling the condensate to its market using WTI pricing from October 2019-February 2020.

76. Each month from October-February, the parties performed the customary account settlement whereby they agreed upon the volume purchased, purchase price, and amount owed by Texican. Texican paid the promised price each month. Never once did Devon object to the promised price.

77. Further, Texican agreed to netting of crude sales at Cushing, Oklahoma based on the ongoing course of dealing between the parties for sales of condensate to Texican in the Eagle Ford production area. Texican reasonably relied on Devon's acquiescence to the repeated use of unsigned contract amendments for price adjustments on sales of Eagle Ford condensate in agreeing to expose itself to credit risk on sales of crude oil to Devon on an "open account" basis.

78. By reneging on the promised and previously settled prices for the September-November 2019 production in March 2020, before paying its debt to Texican for the already

14

completed February deliveries of crude oil at Cushing, Oklahoma, Devon wrongfully and unjustly obtained the benefit of the sum of $1,096,625.74 under the Netting Agreement based on its deceptively timed and unreasonable offset claim.

79. Further, Texican suffered injury because the resale price that Texican agreed to for Devon's condensate sales in September–November 2019 was based on the agreed price it was paying to Devon for the same condensate each of those months. Devon's unreasonable delay in asserting any objection to the pricing for those months in March 2020 needlessly prejudiced Texican, which had reasonably relied on Devon's acquiescence and the parties' consistent course of dealing for months prior to March 2020 in setting its resale prices for those months. It is impossible for Texican to unwind those resale transactions simply because Devon has changed its mind about the price it originally accepted for September–November condensate sales. Injustice can be avoided only by enforcing the Defendant's original promises to abide by the agreed pricing terms for those months for its condensate sales to Texican.

80. As a proximate result of Devon's failure to abide by promises, and unilateral retroactive change to the price for the September-November 2019 production, Texican has been damaged in the amount to be proven at trial.

## COUNT THREE
## QUANTUM MERUIT

81. Texican incorporates by reference the allegations set forth in Paragraphs 1 through 80 of this Complaint as if fully stated herein.

82. At the request and for the benefit of Devon, Texican provided Devon with goods in the form of crude oil at the Enterprise terminal in Cushing, Oklahoma in February 2020.

83. Devon accepted and took possession of the crude oil as requested.

84. Devon was aware that Texican expected to be compensated for the goods provided at Devon's request.

85. Despite due demands, Devon has failed and refused to pay the full sums due to Texican for the provision of goods.

86. Texican is entitled to recover from Devon the reasonable value of the goods received but not paid for by Devon. The total value of the goods received by Devon was $2,756,245.48, but Devon has only paid Texican $1,659,619.74. Therefore, Devon has received but not paid for crude oil from Texican in the amount of $1,096,625.74.

87. The price for the crude oil was a usual, customary, and reasonable price for the purchase of crude oil in Cushing, Oklahoma at the time of the sale in February 2020 and was agreed to by Devon.

88. Texican is entitled to the reasonable value of the goods provided but not paid for in the amount of at least $1,096,625.74.

89. <u>Attorneys' Fees</u>. Texican is entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practices & Remedies Code § 38.001(8).

## COUNT FOUR
## UNJUST ENRICHMENT/MONEY HAD AND RECEIVED

90. Texican incorporates by reference the allegations set forth in Paragraphs 1 through 89 of this Complaint as if fully stated herein.

91. Devon and Texican reached an agreement for the purchase price of condensate that was confirmed through the parties' course of conduct.

92. Devon for its profit, and at the expense of Texican, wrongfully withheld $1,096,625.74 in funds that in good equity and good conscious belongs to Texican.

16

93. This wrongful diversion has caused a significant loss to Texican and unjust enrichment to Devon.

94. Equity requires that the $1,096,625.74 be returned to Texican, its rightful owner.

## V. PRAYER

WHEREFORE, Plaintiff Texican Crude & Hydrocarbons, LLC prays that the Court enter judgment in its favor against Defendant Devon Energy Production Company, L.P. and that Texican recover as follows:

a. Compensatory damages in an amount to be proven, including actual damages, economic damages, benefit of the bargain damages, and direct lost profits;

b. Attorneys' fees and costs under Texas Civil Practices & Remedies Code § 38.001(8) for Counts One and Three;

c. Pre-judgment interest at the maximum legal rate;

d. Post-judgment interest at the maximum legal rate; and

e. All other relief, in law and equity, to which Texican may be justly entitled.

DATED and FILED on May 6, 2020.

Respectfully submitted,

*/s/ Amanda D. Price*
Amanda D. Price, Attorney-In-Charge
Texas State Bar No. 24060935
S.D. No. 1155447
SQUIRE PATTON BOGGS (US) LLP
6200 Chase Tower
600 Travis Street
Houston, Texas 77002-3000
Telephone: (713) 546-5850
Facsimile: (713) 546-5830
Email: Amanda.Price@squirepb.com

OF COUNSEL:

SQUIRE PATTON BOGGS (US) LLP

Greg R. Wehrer
Texas Bar No. 24068592
S.D. No. 1037384
SQUIRE PATTON BOGGS (US) LLP
6200 Chase Tower
600 Travis Street
Houston, Texas 77002
Telephone:  713-546-5850
Facsimile:  713-546-5830
EMail:  Greg.Wehrer@squirepb.com

**COUNSEL FOR PLAINTIFF**