United States District Court
Southern District of Texas
**ENTERED**
April 14, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TEXICAN CRUDE & HYDROCARBONS LLC, | § § § | CIVIL ACTION NO 4:20-cv-01598 |
| Plaintiff, | § § § | |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| DEVON ENERGY PRODUCTION COMPANY LP, | § § § § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Texican Crude & Hydrocarbons LLC and Defendant Devon Energy Production Company LP don't dispute that they entered into a condensate purchase agreement in June 2019. But they do dispute whether the next month they orally modified the pricing formula of that contract for the production months of September, October, and November 2019.

A two-day bench trial was conducted on February 7th and 8th of 2022. See Dkts 87 & 88. Rule 52(a)(1) of the Federal Rules of Civil Procedure provides:

> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

As to factual findings, this "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc v United States*, 153 F3d 225, 231 (5th Cir 1998) (quotation marks and citation omitted). The rule is instead satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." Ibid.

As a matter of law, and for further reasons specified below, the Court concludes that judgment should issue in favor of Texican. To the extent that any factual finding reflects or is better understood as a legal conclusion, it is also deemed a conclusion of law. Likewise, to the extent that any legal conclusion reflects or is better understood as a factual finding, it is also deemed a finding of fact.

### FINDINGS OF FACT

1. Testimony was heard from the following witnesses in this order:

   o Skip Redd, a Texican vice president;[1]

   o Nancy Mann, a Texican crude oil accountant;[2]

   o Yakini Wilson, a Devon revenue accountant;[3]

   o Meagan Huff, a Devon energy marketer;[4]

   o Michael Day, a Devon energy marketer;[5] and

   o Taylor Noland, a Devon energy marketing manager.[6]

2. The following narrative is found to be accurate based upon the weight of credible evidence and testimony received.

---

[1]   Dkt 91 at 9–135 (live).

[2]   Dkt 106 (video deposition).

[3]   Dkt 108 (video deposition).

[4]   Dkt 107 (video deposition).

[5]   Dkt 92 at 4–124 (live).

[6]   Id at 126–50.

3.   Texican is an oil and gas company that conducts full-service purchasing of onshore and offshore production from producers. It frequently purchases production at the wellhead or lease and handles transportation and resale of the production to the downstream market.[7]

4.   Devon is an oil and natural gas production company focused on onshore production in the United States.[8]

5.   Skip Redd (for Texican) and Michael Day (for Devon) each had authority to negotiate on behalf of their respective employers.[9]

6.   Redd and Day reached an agreement in late June 2019 on the purchase of condensate by Texican from Devon. Texican was to begin purchasing condensate from Devon beginning July 1, 2019.[10] The condensate was valued according to a fluctuating price published by a commodity index less a fixed deduct.[11] Of particular importance to this calculation, Redd and Day agreed to ICE BRENT CMA as the index, less $8.30 as the deduct.[12]

7.   Texican and Devon began performance on July 1, 2019. They hadn't executed a written contract at the time.[13] But neither party objected to proceeding with the

---

[7]   Dkt 1 at ¶ 13 (complaint).

[8]   Id at ¶ 8 (complaint) & Dkt 6 at 3 (answer and counterclaims).

[9]   Dkts 91 at 15–16 (Redd testimony) & 92 at 6 (Day testimony).

[10]   Dkt 91 at 15–16 (Redd testimony); see also Dkts 109-5 (06/17/2019 email chain between Redd and Day) & 101-7 (purchase agreement as of 6/25/2019).

[11]   Dkt 91 at 18–19 (Redd testimony).

[12]   Dkt 58 at 4 (admissions of fact); see also Dkt 101-1 (finalized purchase agreement).

[13]   Dkts 58 at 4 (admissions of fact) & 91 at 16 (Redd testimony).

transactions.[14] Day in fact testified—and it is here found—that it's common practice among industry participants to verbally agree to terms and begin performance before receiving written confirmation.[15]

8. Redd sent Day a final version of the written contract on July 3, 2019.[16] The agreement contained (i) the quality of condensate to be purchased, (ii) the pricing formula, (iii) the condensate-producing leases, and (iv) "General Terms and Conditions." Redd signed the contract on behalf of Texican, but Day never returned a countersigned copy on behalf of Devon.[17]

9. The General Terms and Conditions of the final contract contain two provisions pertinent here. *First,* a no-oral-modifications clause states:

> Any modification of these Terms and Conditions or any related transaction documentation shall be by written instrument executed by the parties' respective representatives.

*Second,* a no-waiver clause states:

> No waiver by either party regarding the performance of the other party under any of the provisions of this Agreement shall be construed as a waiver of any subsequent performance under the same or any other provisions.[18]

---

[14]   Dkt 91 at 24–25 (Redd testimony).

[15]   Dkt 92 at 42 (Day testimony); see also Dkt 91 at 129 (Redd testimony).

[16]   Dkts 101-1 (finalized purchase agreement) & 91 at 28–29 (Redd testimony).

[17]   Dkts 101-1 (finalized purchase agreement), 58 at 4 (admissions of fact) & 91 at 28–29 (Redd testimony).

[18]   Dkts 101-1 at 11 (finalized purchase agreement) & 58 at 4 (admissions of fact).

10.   Despite the no-oral-modifications clause, Texican and Devon soon altered the written terms through oral modifications that were later memorialized in email correspondence. For instance, Day several times asked Redd to add additional wells to the agreement, which Redd did.[19] Redd and Day also orally agreed in July that Devon would bear the cost of the letter of credit that it required Texican to post. That cost was reflected in the deduct. The deduct for August thus increased to $8.58 (representing a 28-cent letter-of-credit cost) and then fell to $8.35 in September (representing a 5-cent letter-of-credit cost).[20]

11.   Texican sold the condensate it purchased from Devon to Gibson Energy. It used the same pricing formula to sell to Gibson as it used to buy from Devon—but with a slightly higher deduct. The difference in deduct represented Texican's profit margin.[21]

12.   Gibson requested in early July to switch from the ICE BRENT index to the NYMEX West Texas Index for the September 2019 production month and beyond.[22] Redd consequently asked Day if they could likewise change the index for the Texican-Devon agreement. The pair discussed this issue several times in July.[23] And though disputed, it is determined here that they ultimately reached an oral agreement to make the change beginning September 1st

---

[19]   Dkt 91 at 52–54 (Redd testimony); see also Dkts 102-5 (10/24/2019 email from Day to Redd), 102-6 (11/19/2019 email chain between Redd and Day) & 102-7 (11/22/2019 email chain between Redd and Day).

[20]   Dkts 91 at 35–37, 107–08 (Redd testimony) & 92 at 12–13 (Day testimony); see also Dkt 102-1(08/12/2019 email from Redd).

[21]   Dkt 91 at 11, 19–20 (Redd testimony).

[22]   Dkts 91 at 39, 43–44 (Redd testimony) & 109-11 (07/17/2019 email from Iseman to Redd).

[23]   Dkts 91 at 38–40 (Redd testimony), 92 at 11 (Day testimony) & 58 at 4 (admissions of fact).

and continuing indefinitely.[24] The pair also agreed that the deduct would remain the same—namely, $8.30 plus the letter-of-credit cost.[25]

13.   Redd sent Day an email memorializing this change on July 30, 2019. But the email never reached Day because Redd sent it to Day's old email address.[26]

14.   Because the index price fluctuates from day to day, the final price Texican paid per barrel of condensate was to be determined at the end of each production month. Texican would calculate the average index price from the production month and apply the applicable deduct.[27] It would thereafter send a preliminary run statement to Devon, which reflected the anticipated payment.[28] The accounting department at Devon would receive and review these statements and could flag disputes.[29] Texican would subsequently resolve any disputes, deliver a final run statement, and issue payment.[30]

---

[24]   Dkt 91 at 40–41, 44 (Redd testimony).

[25]   Dkts 91 at 45 (Redd testimony) & 92 at 12 (Day testimony).

[26]   Dkts 101-9 (07/19/2019 email from Skip to Day) & 91 at 41–43 (Redd testimony).

[27]   Dkt 91 at 19 (Redd testimony).

[28]   See Dkts 103-9 (August 2019 preliminary run statement), 104-1 (August 2019 final run statement), 104-4 (September 2019 preliminary run statement), 105-5 (September 2019 final run statement), 105-6 (October 2019 preliminary run statement), 105-7 (October 2019 final run statement), 105-8 (November 2019 preliminary run statement) & 105-9 (November 2019 final run statement).

[29]   Dkt 108 at 12–15 (Wilson testimony).

[30]   See Dkts 104-1 (August 2019 final run statement), 105-5 (September 2019 final run statement), 105-7 (October 2019 final run statement) & 105-9 (November 2019 final run statement).

15.   Devon first raised questions regarding the pricing formula in early October. Yakini Wilson (as a revenue accountant at Devon) emailed Nancy Mann (as her counterpart accountant at Texican) on October 2nd regarding the August 2019 pricing. Internal emails indicate that the revenue department at Devon wasn't aware of the oral agreement between Redd and Day regarding the letter-of-credit cost. Upon inquiry, Mann told Wilson of this change. She also alerted Wilson that "there is a price change September 1."[31]

16.   Day emailed Redd on October 9th to follow-up on the September index change. He specifically stated, "I couldn't find an email switching it over but I know we have discussed it."[32] Redd called Day to remind him of the agreement that they made in July to switch the index. Again, although disputed, it is determined here that Day on that phone call agreed with Redd that they had changed the index.[33]

17.   Texican sent the September preliminary run statement to Devon on October 11th. The pricing contained within the statement reflects that the accounting department at Texican used the NYMEX West Texas Index.[34] Devon didn't dispute that pricing.

18.   Texican issued the September final run statement on October 21st. The pricing contained within the statement reflects that the accounting department at Texican used the NYMEX West Texas Index.[35] Texican

---

[31]   Dkt 102-2 (10/02/2019 email from Day to Flowers).

[32]   Dkt 101-2 (10/09/2019 email from Day to Redd).

[33]   Dkt 91 at 47–48 (Redd testimony).

[34]   Dkt 104-4 (September 2019 preliminary run statement).

[35]   Dkt 105-5 (September 2019 final run statement).

timely paid Devon based on the pricing in that statement. Devon accepted this payment without dispute.[36]

19.   Devon again raised a concern regarding the pricing formula in early November. Wilson emailed Mann on November 6th about what she believed to be a discrepancy in the September payment.[37] Mann reminded Wilson that "there was a price change effective September 1." And Mann attached a screenshot showing that the price index changed from ICE BRENT to NYMEX West Texas Index.[38]

20.   Day emailed Redd that same day, stating, "I know we discussed possibly changing this to [NYMEX West Texas Index] but never saw anything on it." The email also noted that the agreed-upon deduct put the deal "way out of other deals we currently have."[39] Redd again called Day to remind him of their July agreement to change the index as well as their October conversation regarding the same. And yet again, though disputed, it is determined here that Day on that phone call again agreed with Redd that they had changed the index.[40]

21.   Important here is testimony by Taylor Noland that the crude division of Devon (for which Day works) manages as many as 100 active contracts in any given month.[41] And as noted above, Day testified that it's common practice in the industry to orally modify such contracts, only later

---

[36]   Dkt 58 at 4–5 (admissions of fact).

[37]   Dkt 101-3 (11/06/2019 email from Wilson to Mann).

[38]   Dkts 102-10 (11/06/2019 email chain) & 104-7; see also Dkts 106 at 43–44 (Mann testimony) & 108 at 33–34 (Wilson testimony).

[39]   Dkt 101-3 (11/06/2019 email from Day to Redd).

[40]   Dkt 91 at 56–57 (Redd testimony).

[41]   Dkt 92 at 128 (Noland testimony).

memorializing such modifications.[42]   His emails in the record indicate failure on his part to properly track conversations in this regard, thus leading to forgetfulness as to the particulars of past conversations on a given account.[43] This serves generally to undermine the credibility of his testimony.

22.   Texican sent Devon the October preliminary run statement on November 8th. The pricing again reflected that the accounting department at Texican used the NYMEX West Texas Index.[44]

23.   On November 19th, Day requested that Redd call him to discuss the pricing in the October preliminary run statement.[45] Redd called Day that same day and once again reminded him of their July agreement to change the index.[46] Day asked for a written amendment reflecting the index change, which Redd sent the following day.[47] The amended purchase agreement was dated October 11, 2019, and stated, "Effective September 1, 2019 the new price is

---

[42]   Dkt 92 at 42 (Day testimony); see also Dkt 91 at 129 (Redd testimony).

[43]   For example, see Dkts 101-2 (10/09/2019 email from Day to Redd), 102-2 at 1 (10/02/2019 email from Day to Flowers), 102-3 at 1 (10/02/2019 email from Day to Flowers), 103-2 at 1 (11/06/2019 email from Day to Flowers and 12/03/2019 follow-up email from Flowers to Day), & 103-4 (01/06/2020 email from Day to Redd).

[44]   Dkt 105-6 (October 2019 preliminary run statement).

[45]   Dkt 102-8 (11/19/2019 email from Day to Redd).

[46]   Dkt 91 at 57–58 (Redd testimony).

[47]   Dkts 91 at 59 (Redd testimony) & 101-4 (11/20/2019 email from Redd to Day).

NYMEX WTI Merc days only" less $8.35.[48] At no point did Day reject or dispute this amendment.[49]

24.   Texican issued the October final run statement on November 20th. The pricing contained within the statement reflects that the accounting department at Texican used the NYMEX West Texas Index.[50] Texican timely paid Devon based on the pricing in that statement.[51] Devon accepted this payment without dispute.

25.   Chris Flowers served as liaison between the marketing and accounting departments at Devon. He emailed Day on December 3rd inquiring whether he resolved the pricing dispute with Redd. Day informed Flowers that he changed the price formula in Devon's internal accounting system to match the amendment sent. Day also noted:

> I am not fond of accepting their pricing but working on bigger picture deals with them as I type and there was a break down in communication of what the pricing was actually going to be. I have cancelled them, with intent to renegotiate, for Jan 2020.[52]

Day additionally sent a new deal sheet to Devon's contracts department that reflected the use of the amended formula for the September, October, and November production months.[53]

---

[48]   Dkt 101-4 at 2 (amended purchase agreement).

[49]   Dkt 92 at 26–27 (Day testimony); see also Dkt 102-10 at 1–3 (11/06/2019 email chain).

[50]   Dkt 105-7 (October 2019 final run statement).

[51]   Dkt 58 at 4–5 (admissions of fact).

[52]   Dkts 102-9 (12/03/2019 email from Day to Flowers) & 92 at 29–30 (Day testimony); see also Dkt 107 at 20–21 (Huff testimony).

[53]   Dkt 102-10 (11/06/2019 to 12/04/2019 email chain).

26.   Flowers emailed Day on December 4th to confirm that Day agreed with the use of the amended formula, as Devon's internal accounting system didn't reflect the changes made by Day on December 3rd. Day responded, "Contracts probably hasn't changed it yet after I submitted the deal sheet. I will follow up with them."[54]

27.   Texican sent Devon the November preliminary run statement on December 10th. The pricing contained within the statement reflects that the accounting department at Texican used the NYMEX West Texas Index.[55] Devon didn't dispute that pricing.

28.   Texican issued the November final run statement on December 20th. The pricing contained within the statement reflects that the accounting department at Texican used the NYMEX West Texas Index.[56] Texican timely paid Devon based on the pricing in that statement.[57] Devon accepted this payment without dispute.

29.   The parties don't dispute that Redd and Day reached an oral agreement in late November or early December to change the pricing for the December production month. The new pricing continued to use the NYMEX West Texas Index.[58]

30.   Day also canceled the contract for the January production month with an intent to renegotiate.[59] And the parties don't dispute that Redd and Day then orally agreed

---

[54]   Ibid.

[55]   Dkt 105-8 (November 2019 preliminary run statement).

[56]   Dkt 105-9 (November 2019 final run statement).

[57]   Dkt 58 at 4–5 (admissions of fact).

[58]   Dkts 91 at 63–64, 66 (Redd testimony) & 103-4 (01/06/2019 email from Day to Redd).

[59]   Dkt 91 at 61–64, 66 (Redd testimony); see also Dkts 103-4 (01/06/2019 email from Day to Redd) & 109-14 (11/26/2019 email from Day to Redd).

in December to a new pricing formula for the January production month. That new formula continued to use the NYMEX West Texas Index.[60]

31.   Texican didn't learn that Devon disputed the September, October, and November production-month payments until late February 2020. Day emailed Redd regarding the dispute on February 25th.[61] Redd then called Day and Taylor Noland (an energy marketing manager at Devon) on February 27th to discuss the issue.[62] Redd believed that the phone call resolved the problem.[63]

32.   Devon confirmed on March 18th that it would pay Texican $2,756,245.48 for oil that Devon had purchased from Texican under a wholly separate and distinct contract. This amount was calculated pursuant to a netting agreement into which the companies entered in November 2019.[64] The payment was due March 20th.[65]

33.   But Devon instead paid Texican on March 20th in the amount of only $1,659,619.74. The $1,096,625.74 withheld by Devon represents the difference between the amount that would have been due under the ICE BRENT pricing formula and the amount actually paid by Texican under the NYMEX West Texas Index pricing formula.[66]

---

[60]   Dkts 103-4 (01/06/2019 email from Day to Redd) & 103-6 (renegotiated purchase agreement); see also Dkt 91 at 63–64, 67–68 (Redd testimony).

[61]   Dkts 101-10 (02/26/2020 email from Day to Redd) & 91 at 70 (Redd testimony).

[62]   Dkt 91 at 71–72 (Redd testimony); see also Dkt 101-10 (02/26/2020 email from Day to Redd).

[63]   Id at 72–73 (Redd testimony).

[64]   Dkt 58 at 5.

[65]   Dkt 106 at 62–63 (Mann testimony).

[66]   Dkt 58 at 5.

34.   Texican brought this action for breach of contract, along with various equitable claims.[67] Devon counterclaimed for breach of contract, seeking interest on the disputed amount from twenty days after the close of each production month until March 20, 2020.[68]

## CONCLUSIONS OF LAW

A *merchant* is defined under Section 2.104 of the Texas Uniform Commercial Code as

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Texican and Devon agree that they meet this definition.[69] And so, given that they are merchants, Texican prevails under the Texas UCC for three reasons. Indeed, this case is a succinct example of how the Uniform Commercial Code anticipates many of the conflicts that can and do frequently arise between merchants.

*First,* Section 2.209 of the Texas UCC entitles Texican to the funds Devon withheld. That section provides detailed rules for the modification of a written contract:

> (a) An agreement modifying a contract within this chapter needs no consideration to be binding.

> (b) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between

---

[67]   Dkt 1 (complaint).

[68]   Dkt 6 (answer and counterclaims).

[69]   Dkt 58 at 4 (admissions of fact).

13

merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(c) The requirements of the statute of frauds section of this chapter (Section 2.201) must be satisfied if the contract as modified is within its provisions.

(d) Although an attempt at modification or rescission does not satisfy the requirements of Subsection (b) or (c) it can operate as a waiver.

(e) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Texican and Devon are both merchants. On behalf of Texican, Red signed the written contract that he supplied to Day on July 3, 2019. On behalf of Devon, Day never returned a countersigned copy.[70] If nothing else, this is indicative of Day's overall sloppy approach to contracting and record-keeping, which is important in other respects addressed below.

But as to Section 2.209(b) in particular, it makes it very difficult for Devon fairly to assert that it even reached a written agreement with Texican—much less one that then prohibited the oral modifications that plainly happened between these parties. Yet no decision under Section 2.209(b) of the Texas UCC or like provisions of the Uniform Commercial Code adopted in other States appears to have addressed this precise set of facts—as between merchants, one having provided and signed the form with a no-oral-modifications clause, and the other not having counter-

---

[70] See FOF at ¶ 8–9.

14

signed and returned it. However, the official commentary to the Uniform Commercial Code notes that subsections (b) and (c) "are intended to protect against false allegations of oral modifications." UCC § 2-209 cmt 3 (American Law Institute & Uniform Law Commentary 2021). It further notes that the express terms of subsection (b) require that "if a consumer is to be held to such a clause on a form supplied by a merchant it must be separately signed." Ibid. While not at all clear, this further suggests that, as between merchants, it must *at least* be signed by the one seeking to enforce a no-oral-modifications provision. That being so, it is found that such clause here isn't enforceable by Devon, and so the oral modifications that Texican and Devon obviously made are perfectly legitimate and binding. Cf *Wisconsin Knife Works v National Metal Crafters*, 781 F2d 1280, 1284 (7th Cir 1986) (noting that identical proviso under UCC "contemplates that between merchants no separate signature by the party sought to be bound by the requirement is necessary").

Regardless, it can be assumed here that Devon and Texican reached a fully-executed and binding written agreement under which Texican agreed to buy certain condensate from certain wells starting July 1, 2019—including that it excluded modification except by a signed writing.[71] The price of that condensate was set by the ICE BRENT index less $8.30.[72] Still, the record makes it quite clear that Redd and Day did *in fact* orally agree in July 2019 to change the price index from ICE BRENT to NYMEX West Texas Index beginning September 1, 2019, and continuing indefinitely.[73] The deduct was to remain unchanged, namely $8.30 coupled with the monthly letter-of-credit cost.[74] This agreement is corroborated by the testimony of Redd regarding conversations he had with

---

[71]   See FOF ¶ 9.

[72]   See FOF ¶¶ 6–7.

[73]   See FOF ¶ 12.

[74]   Ibid.

Day in July; the email Redd unsuccessfully sent to Day that attempted to memorialize the agreement; the emails from Mann to Wilson noting the price change; the preliminary and final run statements from the September, October, and November production months that reflect the use of the NYMEX West Texas Index; the testimony of Redd about conversations he had with Day in October and November regarding the index change; the written memorialization of the agreement sent by Redd to Day in November; and internal communications among Day and other Devon employees.[75]

Under such assumption, the oral agreement can't be said to have satisfied the requirements of either subsection (b) or (c) of Section 2.209, as it wasn't in writing and involved the sale of goods for the price of $500 or more. But even so, it operated as a retractable waiver pursuant to subsection (d). Indeed, the comment to that subsection explains that it's intended "to prevent contractual provisions excluding modification except by a signed writing from limiting in other respects the legal effect of the parties' actual later conduct." Tex Business Code § 2.209, comment 4. And Texican certainly satisfied its burden to establish such modification. See *Omni USA Inc v Parker-Hannifin Corp*, 798 F Supp 2d 831, 849 (SD Tex 2011), citing *S.K. Apparel Manufacturing Inc v Houston*, 2002 WL 1822406, *2 (Tex App—Houston [14th Dist], no pet): "To prove modification, a party must show that the other side (1) had notice of the change and (2) accepted the change."

Consideration of subsection (e) doesn't alter the result. Devon didn't retract the waiver for the September, October, or November production months by reasonable notification. Devon instead accepted payment on that basis when made.[76] Day and Redd also proceeded to negotiate a

---

75    See FOF ¶¶ 12, 13 & 15–30.

76    Dkts 58 at 4 (admissions of fact); Dkt 92 at 22, 26–27, 35 (Day testimony); Dkt 102-10 at 1–3 (11/06/2019 email chain); Dkt 105-5 (September 2019 final run

new price for the December production month and later canceled the contract with intent to renegotiate.[77] The oral agreement to modify the index beginning September 1st was therefore valid as to the September, October, and November production months.

The no-waiver clause in the written contract doesn't change this result. That clause states that no waiver "shall be construed as a waiver of any *subsequent* performance under the same or any other provisions."[78] In other words, the clause permitted Devon to assert its rights under the contract as to *future* performance regardless of whether it waived those rights in the past. But Devon never invoked this clause. And it can't now invoke the clause to demand strict contractual compliance as to *past* performance.

*Second,* course of performance and usage of trade also entitle Texican to the funds Devon withheld.

Section 1.303(a) of the Texas UCC defines *course of performance* as:

> A sequence of conduct between the parties to a particular transaction that exists if:
>
> (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
>
> (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiescence in it without objection.

Section 1.303(c) defines *usage of trade* in pertinent part as:

---

statement); Dkt 105-7 (October 2019 final run statement); Dkt 105-9 (November 2019 final run statement); see also FOF ¶¶ 15–28.

[77]   See FOF ¶¶ 29–30.

[78]   Dkts 101-1 at 11 (finalized purchase agreement, emphasis added) & 58 at 4 (admissions of fact).

> Any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question.

According to Section 2.202 of the Texas UCC, neither course of performance nor trade usage can be used to contradict the express terms of a contract. But Section 1.303(d) states that those concepts are "relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Indeed, Section 1.303(e) requires that "the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other."

The transaction at issue here involved repeated occasions for performance—namely, monthly oil sales and corresponding payments. While performing this contract, Day and Redd made multiple oral modifications that they later memorialized in informal writings. Both parties knew of the nature of this performance, had the opportunity to object to it, and accepted it without objection. This constitutes a course of performance.[79] Day also testified regarding usage of trade that it's common practice in the industry to make oral agreements, begin performance, and later memorialize the agreement in writing.[80]

Section 1.303(e) requires that the no-oral-modifications clause be construed in light of this course of performance and trade usage. As such, it's clear that the clause permitted the parties to make oral modifications and begin performance under those modifications so long as they later memorialized those agreements in writing. And that's exactly what occurred with respect to the index

---

[79] See FOF ¶¶ 10, 12, 15–18, 20–21, 23 & 29–30.

[80] See FOF ¶ 21.

change. Redd and Day first discussed the issue in July 2019 and made an oral agreement to change the index starting September 1, 2019. The parties then began performing under that modification. And Redd later memorialized the modification by way of the amended purchase agreement.[81]

The fact that Day didn't receive the amended purchase agreement until November 2019 isn't pertinent. Indeed, Section 2.201(b) of the Texas UCC states with emphasis:

> *Between merchants* if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the statute of frauds] against such party *unless written notice of objection to its contents is given within ten days after it is received.*

Day requested on November 19th a written amendment reflecting the index change.[82] Redd provided him that amendment the next day.[83] Texican therefore provided Devon a writing in confirmation of the index-change within a reasonable time. And Day didn't object to this amendment within ten days. Quite the opposite. Day adjusted the pricing in Devon's internal accounting system to reflect this amendment and sent a revised deal sheet to Devon's contracts department.[84] When Flowers questioned this change, Day confirmed that it was accurate.[85]

This document thus satisfied the statute of frauds and served as a written memorialization of the July agreement in satisfaction of the contract's no-oral-modifications clause. This is especially true considering that the contract

---

[81]   See FOF ¶¶ 12 & 16–23.

[82]   See FOF ¶ 23.

[83]   Ibid.

[84]   See FOF ¶¶ 23–28.

[85]   See FOF ¶¶ 25–26.

doesn't speak to the timing of written memorializations, and the parties' course of conduct demonstrates that such memorializations could occur long after the original agreement was made.

In short, the oral agreement between Redd and Day made in July 2019 to change the index from ICE BRENT to NYMEX West Texas Index—beginning September 1, 2019 and continuing indefinitely—validly amended the agreement for the September, October, and November 2019 production months.

*Third,* Section 2.209(b) "permits the parties in effect to make their own Statute of Frauds as regards any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing." Texas UCC § 2.209(b), comment 3. But such a private statute of frauds must still "be analyzed under the rules otherwise applicable to general Statute of Frauds issues." *Brookside Farms v Mama Rizzo's Inc*, 873 F Supp 1029, 1035 (SD Tex 1995).

Section 2.201(c)(3) of the Texas UCC provides one such rule. It states:

> A contract which does not satisfy the requirements of [the statute of frauds] but which is valid in other respects is enforceable with respect to goods for which payment has been made and accepted or which have been received and accepted.

This provision also entitles Texican to the funds Devon withheld. The parties agreed to their own private statute of frauds via the no-oral-modifications provision. And that private statute of frauds is subject to the exception found in Section 2.201(c)(3). See *Brookside Farms*, 873 F Supp at 1035. The payments made pursuant to the orally modified purchase agreement for the September, October, and November production months were remitted by Texican and accepted by Devon. Section 2.201(c)(3) thus

operates to make the oral agreement to modify the index enforceable as to those production months. Id at 1036.

In other words, Devon can't now contest the payments it accepted on the grounds that the contract bars the oral agreement to alter the index. Devon's acceptance and non-objection precludes that argument.

It should be noted that Devon asserts that it's entitled to interest on the $1,096,625.74 that it withheld from Texican due to its claim of being underpaid by Texican from October to December of 2019.[86] Given the finding above that Texican hasn't underpaid amounts due, Devon isn't entitled to interest.

## CONCLUSION

For each of the reasons above, judgment will issue in favor of Plaintiff Texican Crude & Hydrocarbons LLC.

The motion by Plaintiff Texican Crude & Hydrocarbons LLC for a judgment on the record pursuant to Rule 52(a) is GRANTED. Dkt 97.

The cross-motion by Defendant Devon Energy Production Company LP is DENIED. Dkt 100.

The parties are ORDERED to confer regarding an appropriate proposed final judgment in light of this ruling. They must then jointly submit a proposed final judgment by April 28, 2023, noting any disputes.

SO ORDERED.

Signed on April 14, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

---

[86]   Dkt 64 at ¶ 39.